John Burton, State Bar No. 86029
  jb@johnburtonlaw.com
Timothy J. Midgley, State Bar No. 123738
  tim@tmidgleylaw.com
THE LAW OFFICES OF JOHN BURTON
4 East Holly Street, Suite 201
Pasadena, California 91103
Telephone: (626) 449-8300
Facsimile: (626) 449-4417

Attorneys for Plaintiff Joseph Ober

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSEPH OBER,<br><br>    Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES, *et al*,<br><br>    Defendants. | Case No. CV-10-10032 DMG (SH)<br><br>**PLAINTIFF'S DECLARATION OF LEAD COUNSEL JOHN BURTON RE ATTORNEY'S FEES FOR MOTION TO COMPEL DISCOVERY** |

John Burton declares under penalty of perjury as follows:

1. I am a member of the State Bar of California, all California federal courts, the Eastern District of Michigan, the Fourth and Ninth Circuit Courts of Appeals and the Supreme Court of the United States. I am lead counsel for Plaintiff Joseph Ober.

2. This declaration is submitted at the Court's direction in support of Plaintiff's request for an award of attorneys' fees as sanctions based on the continuing failure of Defendant County of Los Angeles to respond to discovery requests and orders. The fees are based on the services of Timothy J. Midgley and myself, as well as our legal assistant Richard Thompson, according to the hours attached as Exhibit A. The amount is set using the same hourly rates I would request in a 42 U.S.C. § 1988 fee petition as the prevailing party at the end of the case.

- 1 -

**Qualifications of the Timekeepers**

3. I graduated from Hastings College of the Law in December 1978, and was admitted in May 1979. During over thirty-four years of practice, I have concentrated on litigation involving the public interest and civil rights in both state and federal trial and appellate courts. Beginning before I was admitted, I worked as a cooperating attorney with the American Civil Liberties Union of Southern California in major Los Angeles Superior Court litigation which resulted in the City of Pasadena's changing its method of electing city council members from an at-large method to district-only to avoid diluting the votes of minority residents. Subsequently, from 1980 to 1984, I was employed by Fleishman, Fisher & Moest, a Los Angeles firm which specialized in First-Amendment litigation. As an associate of that firm, I tried a case challenging practices of the FBI and the CIA in the Central District of California and worked on various appeals including two matters decided on the merits, one in our clients' favor, by the United States Supreme Court.

4. In addition to my public-interest oriented law practice, from 1981 through 1989, I was an adjunct professor of Torts at the University of West Los Angeles School of Law. I instructed first year law students, many of whom are now practicing attorneys, and some are even judges.

5. Since May 1984 I have managed my own firm, focusing primarily on representing plaintiffs in police misconduct actions. For the last five years I have been listed as a Southern California "Superlawyer" in civil rights. My caseload at present consists of approximately ninety percent police misconduct actions, including products-liability litigation against TASER International, Inc., and ten percent personal injury.

6. I campaign locally and nationally to recruit practitioners to represent victims of police misconduct. I am a member of the Board of Directors of the National Police Accountability Project (NPAP) and am a former President of the Board of Directors of Police Watch: the Police Misconduct Lawyer's Referral

1  Service, now LA Police Watch, which includes over 80 such lawyers on the referral
2  panel. I am contacted frequently by practitioners in Los Angeles and throughout the
3  United States for advice on handling cases and issues arising in the police
4  misconduct area.

5      7.   I speak frequently at seminars, conferences and meetings, usually one
6  or more times a year. While I usually address plaintiffs' lawyers (e.g., NPAP, AAJ),
7  I have also spoken to conferences of criminal defense attorneys (ICDA), civil
8  defense attorneys (DRI), and police officers (IPICD).

9      8.   I personally have litigated scores of police-abuse and product-liability
10 cases in both state and federal court, including over 40 that have reached verdicts. I
11 was lead counsel for a team of 12 lawyers who represented the victims of the
12 LAPD's notorious August 1, 1988 raid at 39th Street and Dalton Avenue, which led
13 to $3.5 million recovered, at the time the largest in Southern California history. I
14 served as vice-lead counsel (lead counsel was Hugh Manes) for the team of 16
15 lawyers that represented plaintiffs in *Thomas v. County of Los Angeles*, the class
16 action lawsuit that resulted in significant institutional changes in the Los Angeles
17 Sheriff Department Lynwood Substation and a recovery of $7.5 million, and was co-
18 lead counsel with Barry Litt for a team of 10 attorneys representing plaintiffs in a
19 series of related class-actions to recover damages for people over detained in the Los
20 Angeles County Jail System, and for people subjected to visual body cavity searches
21 after they have been ordered released from jail by a judge. ($27,000,000 recovered.)

22     9.  I was lead trial counsel in the only two-products liability cases to date
23 to result in plaintiffs' verdicts against TASER International, Inc., based on deaths of
24 persons shocked by police with the device. In the first, *Heston v. City of Salinas*, the
25 jury awarded compensatory damages plus $5 million in punitive damages. (The
26 compensatory damages were affirmed on appeal, but the punitive damages were
27 struck because of a defect in the trial court's jury form.) In the second, *Fontenot v.*
28 *TASER International, Inc.*, the jury awarded compensatory damages of $10 million.

- 3 -

1  A third TASER case, *Butler v. TASER International, Inc.,* involving a TASER
2  induced cardiac arrest settled for $2.8 million. These awards have made me perhaps
3  the most well known plaintiff's lawyer on TASER related issues.

4       10.    I have reported decisions as counsel of record in the United States
5  Supreme Court, the Ninth Circuit Court of Appeals, the California Supreme Court,
6  the California Court of Appeal, and various district courts. Last week I argued the
7  *Fontenot v. TASER International* appeal in the Fourth Circuit and expect a decision
8  shortly.

9       11.    Because of my representation of plaintiffs in high-profile cases,
10 including the Dalton Avenue litigation, the Rodney King case, and the 1986 mass
11 beatings of Los Angeles County Jail prisoners following a disturbance in the so-
12 called "Blood Module," and my work on claims against TASER International, Inc.,
13 arising from its training of police officers, I have been profiled in the *California
14 Lawyer* (cover story), *Los Angeles Magazine* and the *Los Angeles Times*. I have been
15 quoted on numerous occasions in the *New York Times* and local newspapers,
16 particularly *The Los Angeles Daily Journal*. I have appeared on national and local
17 television on multiple occasions to address issues relating to police misconduct
18 litigation. I was featured on *60 Minutes* in a TASER related story.

19       12.    I have made presentations to various public bodies, including the San
20 Francisco Police Commission, regarding TASER International products and other
21 police related issues. I have published numerous articles relating to police
22 misconduct in a variety of publications including "Trial," the national magazine of
23 the AAJ (formerly ATLA). I am co-author of John Burton & Peter M. Williamson,
24 *Representing Clients Injured by TASER International Electrical Control Devices* 26
25 Civil Rights Litigation and Attorney Fees Annual Handbook pp. 27-51 (2010).

26       13.    Our legal assistant, Richard Thompson, began working as a paralegal
27 for Hufstedler, Miller, Carlson & Beardsley in 1984. Since then, he has worked for a
28 variety of high quality commercial firms including Arnold & Porter and Whitman,

- 4 -

1 Breed, Abbott & Morgan, where he spent five years. He joined my firm in 1997
2 because of his own desire to work in the field of civil rights, and has been
3 indispensable in carrying through on basic tasks that I would have had to do had he
4 not been available. Mr. Thompson retired last month.

5    14.   Timothy J. Midgley, who has been of counsel to our firm, first qualified
6 as a lawyer in England and Wales in 1976 where he became a litigator. He used
7 those skills from 1980 to 1985 working on the legal aspects of police community
8 relations in a Central London law center.  Mr. Midgley moved to Los Angeles, and
9 in 1986 was admitted to the California Bar and joined Manes & Watson, then the
10 pre-eminent plaintiffs' police-misconduct firm in Southern California.  For most of
11 the past twenty-seven years he has worked full time litigating cases as a plaintiffs'
12 civil-rights and police-misconduct attorney in Los Angeles. He is presently retired,
13 but maintains his bar membership and works on cases which remain pending.

14    15.   Mr. Midgley was involved in many substantial cases over the course of
15 his career, including a number of related class-actions for over-detained Los Angeles
16 jail inmates.  He was lead counsel in state court litigation as part of the team of
17 approximately 10 of the most prominent civil rights attorneys in Los Angeles. Barry
18 Litt was lead counsel and I was vice lead counsel in the parallel federal action. As
19 mentioned above, those cases resulted in a settlement of $27 million and changes to
20 the policies and practices of the Los Angeles County jails.  Other prominent cases
21 include *Musso v. County of Los Angeles* in which Mr. Midgley was co-counsel with
22 Carol Watson in a case involving 70 bicyclists wrongly arrested by officers of Los
23 Angeles Police Department and subjected to illegal searches and confinement by the
24 Los Angeles Sheriff's Department.  That case settled for more than $3.6 million and
25 stipulated changes to the policies and practices of both the Los Angeles Sheriff's
26 Department and the Los Angeles Police Department.

### Hourly Rates Claimed

16. Based on current hourly rates and similar awards, I believe I am entitled to $800 per hour, the Los Angeles average for a partner, and Mr. Midgley at $700 per hour. Mr. Thompson should be compensated at $200 per hour. See Exhibit B. Plaintiff will supplement the showing of customary hourly rates and comparable awards should the Court so request.

### The Work Performed

17. I construe the Court's order as requesting fees for the work performed to obtain discovery from Defendant County of Los Angeles that would not have been necessary had Defendant County responded fully to the requests initially served on them over two years ago. (As the Court is aware, Defense counsel concedes that due to lack of cooperation from the Sheriff's Department much of the requested information has still not been turned over.) This required us to review our time records and segregate those times from times we would have expended preparing the case in any event. For example, we are not including dozens of hours spent reviewing Defendant's document productions. The time included in the time sheets was only that necessary to determine compliance and to identify documents not produced.

18. Plaintiff served interrogatories and requests for production of documents on September 20, 2011. After customary extensions of time, we stipulated to the customary protective order and received preliminary responses from Defendants. Our billings for this motion begin with Mr. Midgley drafting, and my reviewing and editing, a six-page letter, dated November 29, 2011, outlining our contentions that Defendant County should provide further responses, inviting a meeting and conference, and suggesting resolutions. The discussions took place after the holidays, as documented in Mr. Midgley's nine-page letter of February 4, 2012.

19. We attempted to informally resolve all the discovery disputes while conducting a number of depositions during February 2012. Nothing was easy,

however. For example, a few minutes before 5:00 p.m. on February 16, defense counsel canceled a deposition set for the next morning. Later that day, Friday, February 17, defense counsel canceled a deposition set for the following Monday. We had two depositions of individual defendants duly noticed for 10:00 a.m. on February 21, 2012. After the witnesses and defense counsel failed to appear, we called and were told that the depositions were not going forward. Although Defense counsel promised to pay our court reporter's appearance fee of $250, despite repeated requests and invoices this amount has never been paid. During one subsequent deposition Mr. Becks became irate, waiving his arms, and actually smashed a glass water pitcher. We sent him a bill for the replacement, about $40, and despite his promise it was never paid. There were also a number of Rule 30(b)(6) depositions where the deponents did not have the information necessary to answer the questions. One such witness Defendant County produced on March 16, 2012, for example, could not respond to any of the 24 issues identified in the notice.

20. Meanwhile Mr. Midgley worked with defense counsel to prepare a 54-page joint stipulation in support of Plaintiff's motion to compel, which was filed on February 27, 2012. Docket No. 36. We did not ask for sanctions at that time. We just wanted the information so we could go to trial. The joint stipulation process was needlessly complicated by defense tactics. We provided our side of the joint stipulation on February 13.  Despite our repeated requests, we did not get Defendant's contentionss until February 27.  As we were putting the document together for filing, we received another box of documents, which included 332 names of inmates, identified as being present at some time and somewhere in the IRC on the date of Plaintiff's incident.  We had to file the motion as it was, and then Mr. Midgley had to file a supplemental declaration to bring the Court up to date. Docket No. 37.

21. On March 14, 2012, this Court made its first Order compelling discovery. Docket No. 39. Late in the afternoon of April 2, the discovery cut-off

1  date, we received a box of documents, which did not satisfy the Court's Order.  On
2  April 4, 2012, Mr. Midgley sent a three-page letter demanding that the balance of the
3  ordered documents be produced forthwith. They were not, so Mr. Midgley began
4  drafting a second motion to compel, this time requesting sanctions.

5      22.    The motion was not filed at that time, however, because discovery and
6  verifications continued to dribble in from Defendants, but the core issues remained
7  outstanding. There were also settlement discussions ordered by the District Court,
8  which led to a hope that the case could resolve without further litigation of the
9  discovery problems.

10      23.    Meanwhile we filed an ex parte application for the Court to set a date
11  certain for Defendants' discovery compliance, which was granted on May 14, 2012.
12  Docket No. 50. The next day, May 15, the District Court denied Defendant's ex
13  parte application to sever the *Monell* allegations, writing "Defendants merely appear
14  to be mounting a last-ditch effort to avoid their discovery obligations." Docket No.
15  51.

16      24.    With trial looming, we filed an ex parte for leave to file a motion for
17  sanctions, and for modification of the District Court's schedule.  This Court entered
18  an Order on that application dated May 23, 2012, denying all relief other than a
19  recommendation that certain pretrial dates be continued, while the trial date
20  remained set. Docket No. 60. We filed objections to the Order on the ground that
21  there was not sufficient time to get the information, which Defendant had been
22  ordered to produce months before the trial date. While the District Court accepted
23  the recommendations on May 31, 2012 Defendants were ordered to comply with all
24  outstanding discovery orders within 30 days. "Failure to do so may result in the
25  imposition of sanctions in connection with a timely and targeted motion *in limine*."
26  Docket No. 63.

27      25.    Because Defendant did not comply with the discovery orders, we filed a
28  targeted motion in limine, an involved, time consuming task which required us to

1 explain and prove to the District Court six months of convoluted discovery
2 proceedings. As we were preparing our reply brief for filing on September 24, 2012,
3 we received more discovery from Defendants, again making our work more difficult.
4 In any event, the District Court referred the motion in limine to this Court and
5 vacated all dates. Docket No. 120.

6       26.    Apparently as pure coincidence, a year-and-a-half old warrant appeared
7 in the system, causing Plaintiff to be arrested and prosecuted criminally for the
8 underlying incident. The criminal case resolved with a plea to delaying an officer at
9 almost the same time as the Court calendared this matter. The end result was a
10 seven-month hiatus in activity. (While Defendants have suggested that there may
11 now be a *Heck v. Humphreys* bar, they have made no effort to bring that matter to
12 the attention of the District Court. Plaintiff contends that any such motion would be
13 futile, as such a conviction "does not bar a § 1983 claim for excessive force under
14 *Heck* when the conviction and the § 1983 claim are based on different actions during
15 'one continuous transaction.'" *Hooper v. County of San Diego*, 629 F.3d 1127, 1134
16 (9th Cir. 2011); *see also, e.g., Rodriguez v. City of Long Beach*, 2011 U.S. Dist.
17 LEXIS 95539 (C.D. Cal. Aug. 25, 2011).)

18       27.    On July 2, 2013, the parties appeared for a hearing on the motion in
19 limine.  After arguments of counsel, the Court requested that Plaintiff submit a
20 supplemental brief setting forth the remaining discovery issues; the brief was filed
21 on July 11, 2013. Docket No. 138. The Court then issued its detailed order on the
22 remaining discovery disputes relevant to the motion in limine on July 30, 2013.
23 Docket No. 144. The Court requested a telephone status update by August 9.  We
24 both called the clerk and submitted a letter setting forth our contentions.

25       28.    Defendants produced some documents later in August, and a few more
26 this month, but as explained in the joint report filed yesterday, Docket No. 147, there
27 remain substantial issues outstanding.

28

29. The following is a summary of hours, multiplied by the hourly rate Plaintiff claims for this action:

| Timekeeper | Rate | Hours | Total |
| --- | --- | --- | --- |
| John Burton | $800 | 33.4 | $26,720.00 |
| Timothy J. Midgley | $750 | 129.1 | $96,825.00 |
| Richard Thompson (legal assistant) | $200 | 8 | $1,600.00 |
| **Total Fees** | | | **$125,145.00** |

30. I reiterate on behalf of Plaintiff, however, that more significant than compensation for the many hours expended to compel Defendant to do what the law and the Court directed it do is the irreparable prejudice to Plaintiff. Had Defendant turned over the identities, telephone numbers and address of the three dozen inmates who may have seen the altercation involving Plaintiff when the responses were first due almost three years ago, Plaintiff would have had a substantial opportunity to locate neutral eyewitnesses. Locating those witnesses now is much more difficult, and, regardless, no amount of money can restore their faded memories.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 24, 2013, at Pasadena, California.

BY: ___/s/  JOHN BURTON___
Attorneys for Plaintiffs